IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

NAPHCARE, INC.,                          )
                                         )
                    Plaintiff,           )
                                         )
          v.                             )     1:07CV174
                                         )
GUILFORD COUNTY,                         )
                                         )
                    Defendant.           )

## MEMORANDUM OPINION, RECOMMENDATION AND ORDER
## OF MAGISTRATE JUDGE ELIASON

### I. Facts

This contract dispute is before the Court on the parties'
cross-motions for summary judgment.  This case serves as a paradigm
example of how not to go about contracting.  It seems more akin to
trying to plaster a wall by each side throwing the mud and hoping
it will stick and finally cover the wall.  The basic facts of the
case, most of which are undisputed and drawn from their contract
(the Contract), are as follows.  Plaintiff is a corporation in the
business of providing healthcare services to correctional
facilities.  In 2005, Defendant Guilford County issued a Request
for Proposals (RFP) seeking bids for providing healthcare to its
various correctional facilities.  After submitting a bid, Plaintiff
was eventually selected as the entity to provide the services and
the Contract was then executed on July 1, 2005.  The Contract was
originally set to run for three years, but was terminated by mutual
agreement after only four months.

The Contract itself is a one-page document which relies mainly on attachments to supply the bulk of its terms. The first attachment is the RFP (Docket No. 37, Ex. A at 3), which, for some unknown reason, is referred to in the Contract as "the specifications." (<u>Id.</u> at 1.) The second attachment is Plaintiff's proposal (the Proposal) in response to the RFP. (<u>Id.</u>, Ex. B, 1, <u>et seq.</u>) The Contract itself contains only two terms important to the dispute in this litigation. First, it states that "[s]hould there be a discrepancy between the proposal and the specifications, the CONTRACT specifications shall control." (<u>Id.</u>, Ex. A at 1.) Also, the Contract contains a statement that it "has been preaudited in the manner required by the Local Government Budget and Fiscal Control Act." (<u>Id.</u>)

Several terms which are pertinent to the dispute are located in the RFP, which, as stated previously, is attached to the Contract as Attachment A. (<u>Id.</u>) The first of these is found in Subsection F of the section entitled "GENERAL CONDITIONS." That portion of the RFP is entitled "<u>Catastrophic Limits</u>" and apparently is an attempt to set limits on the amount the healthcare provider will need to cover for certain occurrences, i.e. an outbreak of a contagious disease in a jail, a single expensive injury or illness for one prisoner, etc.[1] However, the provision also allows

---

[1]F.    <u>Catastrophic Limits</u>:

1.    $25,000 in the aggregate for each contagious illness infecting more than one (1) inmate;
2.    $25,000 in the aggregate for each injury affecting more than one (1) inmate which injuries arise from the same occurrence;
(continued...)

-2-

providers to submit an alternative proposal employing a single aggregate catastrophic limit which still meets all of the specifications in the RFP. (<u>Id.</u> at 14.)

The next relevant provision is under the heading of "MANDATORY REQUIREMENTS FOR ALL PROPOSALS." Item 8 in the list of requirements states that proposals must express their cost in a certain form. (<u>Id.</u> at 18-19.) It adds that Defendant is willing to <u>share</u> (i.e., assume) costs in certain areas of medical care in order to help the providers accurately predict costs. (<u>Id.</u>) Thus, the RFP clearly requires that Defendant bear some of the prisoner medical costs. It lists injuries to inmates that occur during an arrest, physical injuries suffered by two or more inmates and caused by "a catastrophic occurrence such as a riot or fire," and care for a contagious disease suffered by two or more inmates. Both of the last two items specifically refer back to the "<u>Catastrophic Limits</u>" provision. Item 8 then goes on to warn that Defendant's willingness to assume or share these costs is an exception to the general rule that the provider will cover the costs of medical care. It, again, adds that the exception generally "covers only certain 'precommitment injury' and 'catastrophic' situations." (<u>Id.</u>)

---

[1](...continued)
      3.    $15,000 per inmate for each illness or injury or any continuing medical care directly related to the original injury or illness;
      4.    $25,000 in the aggregate per inmate for illnesses or injuries in total during the term of this Contract.

(Docket No. 37, Ex. A at 14.)

-3-

The next important section of the RFP is entitled "SPECIFICATIONS." (Id. at 20.) It is composed of a list of items that the healthcare provider is expected to handle under the Contract. Subsection O in this list compels the provider to set up a "total pharmaceutical system" which deals with the writing and filling of prescriptions, administration of the medicines, and appropriate record keeping. (Id. at 27.) In Section S, under the heading of Medical Supplies & Equipment, prescription and non-prescription medicals are also deemed to be the responsibility of the provider. (Id. at 28.) Item HH of the list reads, "As denoted, all costs for services defined in Section[s] A though GG are the responsibility of the Provider." (Id. at 30.)

The final applicable portion of the RFP is found in a section labeled "SELECTION CRITERIA," which explains how proposals will be evaluated. (Id. at 33.) Subsection 5 is entitled "PRICE" and states in relevant part that one of the pricing considerations will be the "[b]est catastrophic plan for outside/off site services." (Id. at 34.)

After reviewing the RFP, Plaintiff submitted, and Defendant accepted, a voluminous proposal which is attached to the Contract as Attachment B. The Contract states that Attachment B is also incorporated into the Contract. However, the Contract goes on to say that, because it is so voluminous, only a portion of Attachment B is actually attached. (Docket No. 37, Ex. A at 1.) The Proposal listed an annual fee of $2,129,223.84 based on an average of 1,100 inmates. (Id., Ex. B at 35.) This broke down to a monthly fee of

-4-

$177,435.32. It also noted a per diem rate of $.44 for any inmates over 1,100. These numbers included coverage for juvenile inmates. The Proposal also contained a more expensive alternative staffing calculation and had a brief list of medical and administrative services that were covered by the fee.

Defendant received the Proposal, but had further questions about the pricing. Sharon Harrison-Pope, one of Defendant's employees in charge of reviewing the proposals, contacted Plaintiff and asked that it clarify the Proposal by removing the juvenile facility and clarifying what services were being offered and at what price. (Docket No. 37, Ex. G. Dep. at 16-18.) Plaintiff then submitted a "Cost Proposal Clarification Detail RFP 04-26-05." (Id. unnumbered page.) The Clarification attached to the Contract listed an increased annual cost of $2,307,918.80 ($192,326.57 monthly) for apparently the adult inmates only. (Id., Ex. A at 43.) (The initial proposal had not listed any catastrophic limit.) The Clarification set out an "Annual Alternate Catastrophic Limit" (annual catastrophic limit) of $290,000 with a parenthetical stating "(includes offsite and pharmaceuticals)." (Id.) Thus, apparently for the increased annual fee, Plaintiff was willing to absorb the first $290,000 in "catastrophic costs" and, thereafter, Defendant would be responsible. The Clarification also stated that any savings (i.e., if catastrophic costs did not exceed $290,000 in one year) would be "returned to" Defendant. It contained the same per diem rate (which Plaintiff could charge Defendant) for inmate

counts of over 1,100 and the same list of medical services as the original proposal.

The Proposal also contains a number of other relevant sections pertaining to pharmaceuticals, as will be explained. Much of the Proposal is phrased in a manner similar to an answer to a legal complaint or discovery requests where there is an assertion and then a response. The Proposal is organized to reflect the structure of the RFP with responses such as "Understand/Will Comply" beside most items. In some instances, a brief modification or additional note is added to or substituted for that phrase. In response to the RFP's pharmaceutical requirements set out in "SPECIFICATIONS" under Subsection O, and the medical supplies under Section S, the Proposal simply states "Understood/Will Comply" without any further notes or additions. (Id., Ex. B at 30.) However, the response to Subsection HH reads "Understood/Will Comply (With Clarifications)." It then adds that Plaintiff will be responsible for the costs of items A through GG subject to clarifications in the Proposal document and to pricing details in "**SECTION THREE: COST PROPOSAL**." (Id. at 31.) Section Three does address pharmaceuticals. It states that Plaintiff has an in-house pharmacy that will allow Defendant to save on drug costs. It then states that, "Pharmaceuticals shall be billed back to the County at the Average Wholesale Price (AWP) less 10%." It also states that the County will be responsible for the costs of offsite medical care. (Id. at 33.)

-6-

Following the signing of the Contract, Plaintiff did take over healthcare in Defendant's correctional facilities. Near the end of September 2005, Harrison-Pope asked for and received figures for items that Plaintiff was counting toward the $290,000 annual catastrophic limit. Two things then became apparent to her. First, all pharmaceuticals were being counted, along with all offsite care. Second, the amount of the items was quite large and would easily exceed the limit and cause Defendant to have to pay hefty additional sums for the rest of the year. Defendant did not believe that it had agreed to have all pharmaceuticals count toward the annual catastrophic limit. Plaintiff believed otherwise, and the parties were unable to work out an agreement on this point. They then terminated the Contract effective October 31, 2005.

## II. Claim and Counterclaim

Plaintiff's only cause of action is for breach of contract. It does not claim that Defendant wrongfully terminated the Contract. However, Plaintiff seeks reimbursement for a portion of the offsite medical and apparently all pharmaceutical costs it incurred during the four months that the Contract was in existence.[2] Although Plaintiff has adjusted the amount somewhat during the litigation, it currently states that it incurred expenses of $171,703.77 for offsite care and $111,216.46 for pharmaceuticals. Defendant does not dispute these figures. (Docket No. 42 at 7.) Added together, these amounts produce a

---

[2]Plaintiff says "offsite" refers to "services rendered away from the correctional facilities, but does not state whether that includes offsite pharmaceuticals as well. (Docket No. 38 at 2.)

total of $282,920.23. This total is lower than the annual catastrophic limit of $290,000. However, Plaintiff argues that, because the annual catastrophic limit is an annual limit and the Contract ran for only four months, the annual catastrophic limit should be prorated and reduced to one-third of its full size, or $96,666.67. Plaintiff seeks to recover $186,253.56--the amount by which its total offsite and pharmaceutical costs exceed the prorated annual catastrophic limit.

Defendant contends that Plaintiff is not entitled to recover its pharmaceutical costs and that the annual catastrophic limit should not be prorated. (<u>Id.</u>) This would result in no recovery by Plaintiff. Further, Defendant makes a counterclaim based on the Contract provision calling for a return of the unused portion of the annual catastrophic limit. Defendant seeks to recover $118,296.23, which is the full $290,000 less Plaintiff's offsite care expenses of $171,703.77. Defendant has moved for summary judgment as to Plaintiff's claim, while Plaintiff seeks summary judgment as to both its claim and Defendant's counterclaim.

### III. Summary Judgment Standard

Summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must view the evidence in a light most favorable to the non-moving party. <u>Pachaly v. City of Lynchburg</u>, 897 F.2d 723, 725 (4th Cir.

-8-

1990). When opposing a properly supported motion for summary judgment, the party cannot rest on conclusory statements, but must provide specific facts, particularly when that party has the burden of proof on an issue. Id. The mere fact that both parties request summary judgment does not necessarily mean that the material facts are undisputed. World-Wide Rights Ltd. Partnership v. Combe Inc., 955 F.2d 242, 244 (4th Cir. 1992). "The summary judgment inquiry thus scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient proof, in the form of admissible evidence, that could carry the burden of proof of his claim at trial." Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993) (emphasis added). A mere scintilla of evidence will not suffice. Rather, there must be enough evidence for a jury to render a verdict in favor of the party making a claim. A few isolated facts are not sufficient. Sibley v. Lutheran Hosp. of Maryland, Inc., 871 F.2d 479 (4th Cir. 1989).

As for the applicable law, both parties cite to North Carolina law to support their positions and construe the Contract. There is apparent agreement that North Carolina law controls, so the Court will rely on North Carolina law in deciding the case. Given that the claim and counterclaim both arise under state law, special rules apply. When state law is unclear, the federal court must rule in such a manner as it appears the highest state court would rule if presented with the issue. Where the state's highest court has not decided the particular issue, the federal court should examine the rulings of the lower state courts. Rulings of the

lower courts may be considered as persuasive evidence of state law, but they are not binding on the federal court should it be convinced the highest court would rule to the contrary. <u>Sanderson v. Rice</u>, 777 F.2d 902, 903 (4th Cir. 1985). Furthermore, the federal court must rule on state law as it exists, as opposed to surmising or suggesting an expansion of state law. <u>Burris Chemical, Inc. v. USX Corp.</u>, 10 F.3d 243 (4th Cir. 1993).

## IV. Discussion

The central issue in this case is whether or not Plaintiff's pharmaceutical costs can count toward the annual catastrophic limit. However, before reaching that issue, two other issues must be addressed. First, Defendant asserts governmental or sovereign immunity as a defense to Plaintiff's claims. Second, the issue of prorating the annual catastrophic limit must be settled because it could well end either Plaintiff's claim or Defendant's counterclaim.

### A. Governmental Immunity

Turning first to the question of governmental immunity, Defendant contends that it is immune from Plaintiff's claim. It correctly notes that, as a county, it ordinarily is entitled to sovereign immunity. It cannot be sued absent a waiver of this immunity. <u>Data General Corp. v. County of Durham</u>, 143 N.C. App. 97, 100, 545 S.E.2d 243, 246 (2001). However, entering into a valid contract does waive that immunity as to damages stemming from a breach of that contract. <u>Id.</u> Defendant states that the Contract in this case would be invalid if construed in the manner sought by

-10-

Plaintiff, and could only be valid if construed in the manner sought by it. Therefore, it concludes that a win by Plaintiff regarding the contract construction will automatically result in the application of sovereign immunity and the end of the case.

Defendant's assertion that the Contract would be invalid if given Plaintiff's interpretation, is based on the Local Government Budget and Fiscal Control Act (LGBFCA), N.C. Gen. Stat. § 159-7, <u>et seq</u>. The LGBFCA generally restricts counties' ability to incur financial obligations. It prevents them from taking on such obligations unless a budget ordinance includes an appropriation authorizing the obligation and an unencumbered balance remains in the appropriation to cover the obligation. N.C. Gen. Stat. § 159-28(a). Where an obligation is evidenced by a contract, the contract must have a certificate stating that it has been preaudited to comply with this requirement. <u>Id</u>. Finally, it states that any "obligation incurred in violation of this subsection is invalid and may not be enforced." <u>Id</u>.

According to Defendant, the problem with the Contract was that it "was not preaudited for the Catastrophic Limit obligation which Plaintiff claims."[3] (Docket No. 33 at 18.) Instead, the Contract states that the financial exposure for Defendant under the Contract was not to exceed $2,307,918.34, which is twelve times the preset

---

[3] Nor was the Contract preaudited for the $.44 per diem charge should the jail count exceed 1,100. It would appear that this contract contained contingent clauses which, for some reason, were not preaudited. It may be that because of their contingent nature, such clauses can never be truly preaudited and are to be treated as direct expenses incurred by the County and not subject to the LGBFCA.

-11-

monthly service fee of $192.326.57. Defendant concludes that "[t]o
the extent that the Contract calls for payment amounts in excess of
the monthly fee, such as [P]laintiff's claim under the Catastrophic
Limit, such amount was not preaudited pursuant to N.C. Gen. Stat.
§ 159-28(a), and is thus not a valid and enforceable obligation of
the County." (Id. at 18-19.)

There are two problems with Defendant's immunity argument.
The first is that, if Defendant is correct, the Contract here WAS
invalid ab initio no matter whose interpretation is used.  This is
because the Contract was preaudited for only the basic monthly
service fee.  Whether or not the annual catastrophic limit should
be interpreted to include the costs for pharmaceuticals, it clearly
does include the offsite medical costs and, therefore, the
potential existed that the "preaudit amount" would be exceeded.
According to Defendant's argument, any time the limit was exceeded,
the Contract would then exceed its preaudited amount and would
become an invalid contract under North Carolina law.  Moreover,
because the Contract contemplated payments exceeding the preaudited
amount, it was necessarily invalid under Defendant's construction
of the LGBFCA.  This means that the parties negotiated a contract
with the intent that it become invalid during the course of its
performance.  And, even if the Contract only became invalid once
the preaudited amount was exceeded, they would have no way of
knowing until after the Contract was fully performed and the annual
catastrophic limit either was or was not exceeded whether they even
had a valid contract.  Nor could an amount ever be preaudited to

-12-

cover any expenses over the annual catastrophic limit because the parties could not know before performance whether it would be exceeded and/or by how much. They could only predict. In short, either Defendant's sovereign immunity argument is incorrect, or Defendant negotiated and invited the insertion of an obligation into the Contract that rendered it invalid. This could hardly be called an exercise of good faith in negotiations and the Court does not wish to presume that Defendant negotiated the Contract in bad faith.[4,5]

The second problem for Defendant is that it has been unable in any of the three briefs it has filed during the summary judgment process to cite a case directly supporting its argument. Instead, it cites only to cases finding that the lack of the preaudit certificate required by N.C. Gen. Stat. § 159-28(a) will render a contract invalid. See Finger v. Gaston County, 178 N.C. App. 367, 631 S.E.2d 171 (2006); Data General, supra; Cincinnati Thermal Spray, Inc. v. Pender County, 101 N.C. App. 405, 399 S.E.2d 758 (1991). The Contract has such a certificate. None of the cases state that the failure to cover a contingent amount of an otherwise valid contractual obligation will render the contract invalid.

---

[4]It is also worth noting that it is unlikely that the annual catastrophic limit provision is unique to contracts entered into by counties in North Carolina or even by Defendant itself. If Defendant is correct, it is difficult to see how any contingent provision could ever become operational given that the applicability and cost cannot be accurately assessed in a preaudit.

[5]While not suggested by the parties, one solution might be to say that the catastrophic limit alone is invalid. This, however, could trigger other problems, such as whether Plaintiff should be held responsible for any of the offsite care. As will be seen, there is a simpler avenue available for resolving the issue.

And, because the Contract was prematurely terminated, the payments made to Plaintiff by Defendant under any construction of the Contract will not exceed the preaudited amount. By adopting this resolution for this case, the Court avoids deciding the more difficult issue of whether the LGBFCA allows the inclusion of contingency provisions in government contracts. That issue is best resolved by the state courts. However, if Defendant believes this to be the case, it should never again allow any contingency provisions in any of its contracts. Otherwise, it would be intentionally negotiating in bad faith.

Given Defendant's failure to cite any case law supporting its specific position, the Court should reject Defendant's position for the reasons already set out above. It is not the role of this Court to create state law. Certainly, the Court should not create North Carolina law that would invalidate not only the Contract in the present action, but likely many other similar contracts around the state. Defendant's assertion of sovereign or governmental immunity should be rejected. Its motion for summary judgment on this issue should be denied and Plaintiff's should be granted to the extent that it is held that the Contract is not rendered invalid by the LGBFCA.

## B. Prorating the Annual Catastrophic Limit

The next issue for preliminary consideration is whether or not the annual catastrophic limit should be prorated. This issue is critical because a decision not to prorate the annual catastrophic limit will end Plaintiff's claim, while a decision to prorate will

-14-

guarantee a recovery for Plaintiff of at least the offsite costs minus $96,666.67. Prorating the annual catastrophic limit will also have the effect of ending Defendant's counterclaim.

"A court's primary purpose in interpreting a contract is to ascertain the intention of the parties." Glover v. First Union Nat. Bank of North Carolina, 109 N.C. App. 451, 456, 428 S.E.2d 206, 209 (1993). Language in a contract is ambiguous if it is "fairly and reasonably susceptible to either of the constructions asserted by the parties." Id. (citing St. Paul Fire & Marine Ins. Co. v. Freeman-White Assoc., Inc., 322 N.C. 77, 366 S.E.2d 480 (1988)). In making this determination, "'words are to be given their usual and ordinary meaning and all the terms of the agreement are to be reconciled if possible.'" Anderson v. Anderson, 145 N.C. App. 453, 458, 550 S.E.2d 266, 269-270 (2001)(quoting Piedmont Bank and Trust Co. v. Stevenson, 79 N.C. App. 236, 240, 339 S.E.2d 49, 52 (1986)). Finally, "a contract must be construed as a whole, considering each clause and word with reference to all other provisions and giving effect to each." Marcoin, Inc. v. McDaniel, 70 N.C. App. 498, 504, 320 S.E.2d 892, 897 (1984)(citing State v. Corl, 58 N.C. App. 107, 293 S.E.2d 264 (1982); 4 Samuel Williston, A Treatise On The Law of Contracts § 618(3) (3d ed. 1961)).

The problem with knowing whether to prorate the catastrophic limit arises because, as the parties concede, the Contract itself is silent on the matter. It sets an annual catastrophic limit of $290,000 and provides for a return of any unused portion of that limit on an annual basis. It contains a cancellation provision

-15-

allowing for early termination, but that provision does not address the question of whether or not the annual catastrophic limit and return amount should be prorated in the event of early termination. There simply is no language covering the issue.

In such a situation, North Carolina law sometimes allows terms to be implied if the terms are needed for the parties' intent to be satisfied. According to the North Carolina Court of Appeals:

> The doctrine of implication of unexpressed terms has been succinctly stated as follows:
>
>> "Intention or meaning in a contract may be manifested or conveyed either expressly or impliedly, and it is fundamental that that which is plainly or necessarily implied in the language of a contract is as much a part of it as that which is expressed. If it can be plainly seen from all the provisions of the instrument taken together that the obligation in question was within the contemplation of the parties when making their contract or is necessary to carry their intention into effect, the law will imply the obligation and enforce it. The policy of the law is to supply in contracts what is presumed to have been inadvertently omitted or to have been deemed perfectly obvious by the parties, the parties being supposed to have made those stipulations which as <u>honest</u>, <u>fair</u>, <u>and</u> <u>just</u> <u>men</u> <u>they</u> <u>ought</u> <u>to</u> <u>have</u> <u>made</u>."

<u>Shelton v. Duke University Health System, Inc.</u>, 179 N.C. App. 120, 633 S.E.2d 113 (2006)(quoting <u>Lane v. Scarborough</u>, 284 N.C. 407, 409-11, 200 S.E.2d 622, 624-25 (1973)(emphasis added)).

The parties here simply omitted dealing with the issue of whether or not the annual catastrophic limit and the accompanying refund provision should be prorated if the Contract was terminated early. While either of them could easily have put in such a clause, neither party proffers any reason for the omission or that

-16-

it was even considered at all. It may have been, and likely was, just an oversight.[6] In such a situation, it becomes incumbent on the Court to supply the missing term or clause. In doing this, it will apply the principle of North Carolina law which requires the Court to supply the missing term or provision in a way that "honest, fair, and just" persons would have done in order to give effect to the bargain they created.

Neither party has cited any case law discussing an omitted early termination-proration clause, nor is the Court aware of any North Carolina case law addressing this specific topic. However, there are a handful of insurance cases from other jurisdictions which are instructive, at least as far as identifying some general principles.

In <u>Continental Ins. Co. v. PACCAR, Inc.</u>, 96 Wash. 2d 160, 634 P.2d 291 (1981), PACCAR was a corporation that purchased an insurance policy from Continental. The policy had a per occurrence deductible of $50,000 and an annual cumulative deductible of $500,000. Continental cancelled the policy early and litigation ensued. One of the issues was whether the $500,000 cumulative

---

[6]It is true that Plaintiff did propose a unified contract which contained a term requiring monthly reconciliation of the annual catastrophic limit. It also contained a clause that would have prorated the annual catastrophic limit in the event of an early termination of the Contract. (Docket No. 33, Ex. A, Ex. 10, § 9.3.) Defendant rejected this unified contract because parts of it conflicted with the RFP. Notes written on the face of the document show that Defendant had a problem with Plaintiff's proposal to bill against the annual catastrophic limit on a monthly basis. Defendant only wanted to start paying when the $290,000 limit was exceeded. There was no opinion expressed on the issue of proration as a result of early termination of the Contract. And, to the extent Defendant might argue that the exhibit shows it rejected proration, the more important point is that Defendant did not include a proration clause, thereby belying any such argument.

deductible should be prorated for the portion of the year that the policy had been in effect.

Prorating the aggregate limit was determined to be appropriate for two reasons. First, this seemed more consistent with the parties' bargain. The policy had been set up so that PACCAR's yearly liability was limited to the $500,000 deductible. Because PACCAR's per occurrence liability was limited to the $50,000 deductible, there was less chance of the cumulative limit being reached early in the year. This meant there was more of a chance that Continental would have the benefit of not paying because of the cumulative deductible early in the year. The chance that the cumulative limit would be exceeded grew throughout the year. Because the premium on the policy was constant, the court reasoned a failure to prorate would have resulted in Continental receiving premiums at a rate designed to account for the risk of the cumulative deductible being exceeded near the end of the year, but without it having to face that risk. In other words, its risk would be substantially lowered. Id. at 164-65, 634 P.2d at 293.

The second reason given by the court was that not prorating would have left open the potential that a party in Continental's position could have manipulated matters by terminating a policy early when it saw that an annual aggregate would likely be reached or exceeded by a great amount. Acknowledging that Continental had not engaged in such behavior, the court still wanted to establish a rule that would discourage such behavior in future cases. Id. at 167-68, 634 P.2d at 294-95.

-18-

A second instructive case is _OneBeacon Ins. Co. v. Georgia-Pacific Corp._, 474 F.3d 6 (1st Cir. 2007). There, an insurance policy involved a $10 million annual aggregate limit and a $10 million per occurrence limit. The policy was cancelled by the insured after three months. Much later, the insured sought to have the insurer cover $10 million in multiple asbestos product-liability losses. The insurer attempted to cap its liability at $2.5 million by prorating the $10 million aggregate limit for the three months the policy was in effect.

The First Circuit declined the invitation. In doing so, it set out a couple of salient points. First, as in _PACCAR_, the party most responsible for drafting the contract should bear the onus of any ambiguity created by not adequately covering the prorating issue. This was the insurance company. Second, and even more importantly, accepting the insurer's argument would have meant that the aggregate limit was less than per occurrence limit. Such a construction would naturally skew the policy from the normal provisions and operation of such policies. Even the insurer conceded that it would not have sought to prorate the per occurrence amount if all of the liability had come from one incident. Thus, prorating the aggregate limit would produce a result which would less likely embody the reasonable expectations of the parties for such policies. _Id._ at 7-8, 10. Not prorating produced a fairer, more reasonable result.

Finally, the case of _United States Mineral Products Co. v. American Ins. Co._, 348 N.J. Super. 526, 792 A.2d 500 (2002),

-19-

involved whether aggregate liability limits should be prorated when there was a policy extension that ran for only two weeks. The extension prorated the premium, but was silent as to whether the aggregate limit should also be prorated. The insurer claimed that it should be, while the insured maintained that it was entitled to the full amount of coverage contained in the policy prior to the extension. That court was also forced to imply the parties' intent from unexpressed terms. It held that even though the insurer only charged the insured about 1/26th of a full annual premium, it still assumed the risk of being liable for $10 million in claims should they arise during the two weeks that the policy was in effect. <u>Id.</u> at 556-57, 792 A.2d at 523. It reasoned that the reduced premium reflected a reduced time for the risk, as opposed to both a reduced time for and reduced amount of risk. <u>Id.</u> at 558-59, 792 A.2d at 524-25. It noted that the burden would be on the insurer to show that the limit should be prorated because prorating the limit would amount to reducing coverage. <u>Id.</u>

Taken together, <u>PACCAR</u>, <u>OneBeacon</u>, and <u>United States Minerals</u> stand for three important propositions. One is that the structure and purpose of the parties' agreement is important because that is the measuring stick for the reasonable expectations of the parties. The second is that policy considerations mandate that silent contracts not be construed in such a way as to allow or encourage one party to take unfair advantage of the other or gain a windfall. And third, the party most responsible, if any, in creating the ambiguity may have to bear the consequences.

-20-

Applying the rules from the above cases to the Contract, the better implied construction of the Contract requires that the catastrophic limit provision of the Contract be prorated as a result of the mutual, early termination of the Contract. Plaintiff's original proposal offered a monthly fee of about $177,000 with all pharmaceuticals and offsite care being billed back to the County at discounted rates. It also included both the juvenile and adult facilities at this price. When asked for clarification, Plaintiff added the annual catastrophic limit and associated language, but cut out the juvenile facilities. However, it increased the monthly fee to over $192,000. Clearly, this signaled that Plaintiff was willing to take on an annual burden of no more than $290,000 in "offsite and pharmaceuticals" costs[7], but only in return for a significant monthly fee increase.[8] In other words, Plaintiff bore the costs up to $290,000, even if the entire limit was reached early in the Contract, but did so also knowing that it would be compensated by monthly premiums later in the year. Defendant was to pay a certain amount monthly so that its costs were certain until the annual catastrophic limit was reached. It

_____

[7]The meaning and applicability of the "offsite and pharmaceuticals" phrase will be discussed further below. It need not be construed for purposes of the present issue.

[8]The exact amount of the increase is difficult to determine because the removal of the juvenile facility from the Proposal would have dropped the original fee by some undefined amount. The fee was then increased from the reduced amount to an amount $180,000 over the original quote to account for the annual catastrophic limit. Therefore, the increase can only be calculated to be some amount over $180,000. It may well have been that the adjusted fee was increased by the entire $290,000 given that only $110,000 separates the annual catastrophic limit from the $180,000 annual fee increase. It seems likely that covering the juvenile facility would have cost at least that much.

then had the burden of paying the covered costs from that point forward. This had the benefit of helping make Defendant's costs more certain under the Contract and allowing it to make payments on those costs over the course of the year.

The increased fee for an annual catastrophic limit exchange is made even clearer by the return provision of the clarified proposal. The Clarification states that any savings on the annual catastrophic limit will be returned to Defendant. Again this signals that the annual catastrophic limit was nothing more than a way to let Defendant estimate and spread out the payments for whatever costs were being counted toward the annual catastrophic limit. If the money was not used, it was to be returned.

Viewed this way, it could not have been the intent or reasonable expectation of the parties that Plaintiff had to bear the entire $290,000 burden for costs incurred early in the performance of the Contract, even if it was deprived by early termination of the later monthly fees that were intended to cover those costs. In essence, Plaintiff carried the costs knowing that it would be paid back by the monthly fees. Because termination prevented those fees from being paid, it is more reasonable that the catastrophic limit be prorated so that Plaintiff only assumes the proportional risk for those months that Plaintiff received the monthly fees, i.e., 1/3 of $290,000 or the prorated amount of $96,666.67. This construction of the Contract better encapsulates the parties' expectations about what exactly was being paid for in the Contract and this is in line with the decisions in PACCAR,

-22-

<u>OneBeacon</u>, and <u>United States Mineral</u>.[9]  In essence, the shortened contract should function as close as possible to the way the full contract would have functioned.

Moreover, Defendant's construction, which is embodied in its counterclaim, produces an unfair, inequitable result so as to demand a construction providing for proration.  It will be remembered that Defendant insists that it is entitled to be paid $290,000 less Plaintiff's offsite expenses.  But, any "return" of the $290,000 beyond a prorated portion would amount to a refund of money that Defendant was scheduled to pay, but never did pay, through the remaining monthly fees.  It is axiomatic that money which is not paid cannot be "returned."  Defendant paid only one-third of the increased monthly fees, when twelve monthly fee payments were intended to cover the added $290,000 annual catastrophic limit provision of the Contract.  Prorating the return provision of the Contract is the only way to do justice to the parties' original intent and prevent Defendant from gaining an undeserved windfall.  To do otherwise is to contort the word "returned" beyond its plain meaning.

The absurdity of Defendant's construction can be readily seen if the Contract had ended in one month.  Under Defendant's construction, Plaintiff would owe Defendant an amount far greater than the first monthly fee payment.  And, finally, not allowing proration would encourage future parties in Defendant's position to

_____

[9]Also, in this Contract, Defendant was the controlling party with the greatest bargaining power.  Thus, it should not be allowed to profit because of the ambiguity for which it may be held more accountable.

monitor costs going toward the annual catastrophic limit and then terminate the agreement just before the limit was reached in order to avoid paying overages. The common rationale found in <u>PACCAR</u>, <u>One Beacon</u>, and <u>United States Mineral</u> argues against allowing the construction advanced by Defendant. This policy whereby courts are admonished to avoid a construction of a contract which would produce a windfall or allow a party to terminate an agreement in order to take advantage of the other party strongly supports prorating the annual catastrophic limit in the present case.

Prorating the annual catastrophic limit will mean that Plaintiff can recover for all costs countable toward the annual catastrophic limit which exceed $96,666.67 and that Defendant is not due any return of its fees if the costs exceed that amount.[10] Defendant's motion for summary judgment should be denied on the issue of prorating the annual catastrophic limit both as it relates to Plaintiff's costs and to any extent that it would support Defendant's counterclaim. Plaintiff's motion for summary judgment should be granted on this issue.

### C. Pharmaceutical Costs

Thus far it has been determined that Defendant is not entitled to immunity and that the annual catastrophic limit should be

_____

[10]Defendant expresses concern that prorating the annual catastrophic limit will be unfair because of seasonal fluctuations in the numbers of inmates or diseases. It also claims that prorating the limit does not account for the costs of stocking the pharmacy at the start of the contract. As for the first point, Defendant has not introduced evidence supporting its fluctuating costs theory or showing that Defendant, as opposed to Plaintiff, would be harmed by fluctuations in this case. As for stocking the pharmacy, this would only be a concern if pharmaceutical costs can be counted toward the annual catastrophic limit. Defendant says they cannot be so counted. That issue is settled below.

-24-

prorated to reflect the four months that the Contract was in effect. However, the key issue in the litigation remains: Did Plaintiff properly count all pharmaceutical costs toward the annual catastrophic limit?

Turning first to the RFP, its language is clear on this issue. It plainly states that pharmaceutical costs are to be the responsibility of the provider. (Docket No. 37, Ex. A at 28.) Nothing in the RFP alters this requirement. It is true that Section F invites bidders to propose an alternate catastrophic limit proposal meeting all the RFP specifications without setting clear parameters as to what can be included. However, the catastrophic limits only apply in instances of contagious illness, expensive injuries to multiple inmates, or large expenditures for any one inmate. (Id., Ex. A at 14.) Other portions of the RFP indicate that Defendant is willing to share costs for precommitment injuries, "catastrophic" occurrences such as fires and riots, and contagious illnesses. (Id. at 18.) These provisions are generally consistent with the per occurrence and per inmate catastrophic limits which had apparently been a part of past service agreements used by Defendant. The RFP also states that one of the criteria in judging proposals that are submitted is the "[b]est catastrophic plan for outside/off site services." (Id. at 34.)[11] None of these items alter the requirement that pharmaceutical costs are the responsibility of the provider. They only allow costs for

_____

[11]It should be noted that the catastrophic limits provisions do not distinguish between onsite or offsite care.

-25-

catastrophes such as riots, contagion, fires, and precommitment injuries, and apparently offsite care, to be counted toward an annual catastrophic limit. Nothing in the RFP indicates that pharmaceuticals can be counted toward the annual catastrophic limit.

Plaintiff's proposal and the subsequent clarification are literally clear if assessed by themselves. The Proposal plainly states that Plaintiff accepts responsibility for prescribing pharmaceuticals and that it will cover the costs for a list of items, including pharmaceuticals, except where otherwise noted in Section III of the Proposal. Section III then unequivocally sets out a plan under which both pharmaceutical and offsite medical costs are billed to Defendant. It states that by providing most care onsite, the costs to Defendant are reduced. The Clarification includes the annual catastrophic limit addition, which was absent from the original proposal, and states that it includes "offsite and pharmaceutical" costs--the same costs noted in Section III as being billed back to Defendant. Obviously, Plaintiff intended to have Defendant pay for all offsite medical costs and both onsite and offsite pharmaceutical costs over $290,000. What is equally clear is that the Proposal conflicts with the RFP and some of Plaintiff's responses to the RFP in the Proposal.

Unfortunately, rather than iron out these obvious differences to form a unified document, the parties instead chose to simply sign the bare bones contract stating that it was composed of the terms of these two contradictory documents. The inconsistent

-26-

approaches to the pharmaceutical costs would pose an unsolvable problem but for a single sentence in the Contract itself. As previously set out, the Contract includes a provision that "[s]hould there be a discrepancy between the proposal and the specifications, the CONTRACT specifications shall control." The word "discrepancy" is not defined, but, according to North Carolina law, words of a contract must be given their plain and ordinary meaning. <u>Anderson</u>, <u>supra</u>. Webster's defines "discrepancy" as a "[d]isagreement, as between facts: inconsistency." <u>Webster's II,</u> <u>New Riverside Dictionary</u> (1st ed. 1984). Whatever breadth might be given to the term "discrepancy" in the Contract, the differing treatment of pharmaceutical costs in the RFP and the Proposal and Clarification meets this definition. The two documents obviously disagree on this point. In such a circumstance, the parties agreed that the terms of the RFP control. Those terms unequivocally require that pharmaceutical costs, or at least onsite ones, be the responsibility of the provider.

Plaintiff tries to avoid this conclusion by arguing that, if the terms of the RFC always control, there is no reason to have included the Proposal in the terms of the Contract at all. First, that may well be true, but it does not help Plaintiff. Second, Plaintiff's hypothesis in the actual operation of this Contract is not correct. The Proposal includes financial details such as the price, the amount of the annual catastrophic limit, the fact that the catastrophic limit applies to offsite services, and other important details such as staffing levels and the manner in which

-27-

certain services will be provided. These items are necessary items, or at least supplement the RFP without differing from it in a way that creates a "discrepancy." Granted, as to some items it might be difficult to tell which terms are supplemental and which would be a "discrepancy," but this is not true of the diametrically opposed pharmaceutical costs provisions. On that point, the RFP must control according to the plain language of the Contract. Defendant's motion for summary judgment should be granted, and Plaintiff's denied, as to the issue of the pharmaceutical costs.

### V. Conclusion

Both parties are entitled to summary judgment on certain issues. Plaintiff is entitled to summary judgment on Defendant's assertion of qualified immunity and on the question of whether or not the annual catastrophic limit and its associated return provision should be prorated. However, Defendant wins on the issue of whether Plaintiff can recover for pharmaceutical costs. In terms of recoveries, all of this means that Plaintiff is entitled to recover its offsite care expenses, which it claims are $171,703.77, minus the prorated annual catastrophic limit of $96,666.67. This produces a total of $75,037.10.[12] Defendant is entitled to no recovery on its counterclaim. Because both parties prevailed on some of their arguments, and both shared in the making of the dispute, both sides should bear their own costs.

---

[12]There does not appear to be a dispute concerning this number, but the parties have given scant attention to the matter.

**IT IS THEREFORE RECOMMENDED** that Plaintiff's motion for summary judgment (Docket No. 37) and Defendant's motion for summary judgment (Docket No. 32) be granted in part and denied in part as set out above.

**IT IS FURTHER RECOMMENDED** that judgment be entered against Defendant in the amount of $75,037.10, plus post-judgment interest at the legal rate in effect to accrue thereon from the date of Judgment forward until paid, and that each side bear their own costs.

**IT IS ORDERED** that objections are due on or before September 23, 2008 and responses are due on or before September 28, 2008.


_____
      United States Magistrate Judge

September 18, 2008